19-3048 You may proceed when you're ready My name is Anthony Vannucchi. I represent the plaintiff in this case, Mark Benjamin. This is an appeal from a summary judgment on a retaliatory discharge claim brought under Kansas state law under Kansas' whistleblower exception to the at-will employment doctrine. The whistleblower exception allows for employees to have a private cause of action if they are terminated after they have reported some wrongdoing that pertains to public health, public safety, and public welfare. And in this case, these cases are all decided under the rubric of McDonnell-Douglas. There must be a prima facie case made by the employee. And if that's made, then if the employer comes forward with a rationale that supports a non-discriminatory or, in this case, a non-retaliatory action, then the burden should affect the plaintiff and the employee. And he must show that there was some pretext, that the reason that the employer gave wasn't the real reason why he was terminated. It was actually just cover for the retaliation. And this case really boils down to the district court granted summary judgment based on the court's finding that there was a failure of proof on the pretext question. So here, that was error because, in this case, there are several pieces of evidence, the whole universe of evidence in the case that would give a reasonable juror grounds to find that the reasons given by the college here for terminating Mr. Benjamin were pretextual. What happened in this case was Mr. Benjamin was a college basketball coach for Barton County Community College in Kansas. In February of 2016, I believe, I'm sorry, in February of 2017, he reported that the college, he reported to the athletic director, Mr. Rawls, that the college had been paying for student-athlete travel in violation of the conference rules that govern the conference and prohibited the school from paying for student-athlete travel. And about six weeks later, athletic director Rawls initiated the process to remove Coach Benjamin as the coach. And about a couple of weeks after that, the college terminated its contract. So February, the disclosure is made. April, the process is initiated. Yes, Your Honor. And he's terminated in June. Terminated in May, I think May 8th. Before his contract was up. That's right, Your Honor. Before his contract was up. The reasons given by the college and the reasons cited by the district court were that he had been insubordinate, that he had made harassing and had been verbally harassing players, and that he had been running the program in a manner that was unprofessional and in violation of the terms of his contract. And the problem with that is that, first of all, the timing. And as I said, this happened weeks after he reported this wrongdoing. And the reasons given by athletic director Rawls, he created a report the day that he decided to terminate, that he was going to move to oust this coach. The reasons given were, there were several, to be candid, but several of those reasons lacked credibility. Take, for example, the grounds that Mr. Coach Benjamin had failed in his duties as a softball coach by failing to recruit enough student athletes for the 2016-2017 season. The record shows that Mr. Rawls would have known and did know that that was actually false. Mr. Coach Benjamin explained in his deposition testimony that the reason that there were six or seven players that had left the program for various reasons specific to their own circumstances, having nothing to do with any failure of recruiting, that happened in the summer of 2016. And at the same time, Coach Benjamin was out on the recruiting trail, recruiting players for the next season as the normal recruiting cycle would go. And he secured 13 letters of intent for that next season. So there wasn't a failure of recruiting. And more importantly, the athletic director knew a reasonable inference can be drawn that he knew that there wasn't a failure in recruiting. And yet, he cited that in this report that he created on the day that he decided to oust, or on the day or near the day that he decided to oust Mr. Coach Benjamin. It's true, though, that for the period after, for the season after June 2016, the team had been decimated with departures, right? Your Honor, it is true that there were, I think, six or seven players that had left on the timeline that Your Honor mentions. But that was due to their own circumstances. According to Mr. Benjamin's testimony, and at summary judgment, we have to credit Mr. Benjamin's testimony on that. And so there wasn't— —people who testified, either their parents testified or they testified, that he had made terrible statements to them? Your Honor, I don't—I candidly don't think so, but I don't know that 100%, and I'd hate to say that and be wrong. Was there any season before the one beginning June 2016 where Benjamin's team had been fraught with so many departures? That doesn't appear in the record, no. And that brings up— That is something new. It is, certainly. But again, Coach Benjamin gave his explanation for that in his deposition testimony, explained what those players were telling him at the time, and that can be found in the appendix at page 236 and then again at 238, his deposition testimony explaining— A flavor for why he says they left. Well, one person decided to not play softball anymore. One person had to go back home to Washington, for example. There were personal reasons given to him, and those are the reasons that he testified to, and thus creating— None of them were because they didn't like him as a coach. That's not his testimony, and I don't think that's in the record about what those folks were leaving for. Can you defeat pretext—can you meet your pretext burden based on using his testimony? I mean, what if the record shows that the same players that told him, I'm leaving for personal reasons or I've got to go back home to Washington, told Rolf or somebody connected to Rolf, I can't stand that guy. He says all these nasty things, and I'm just not going to be part of it. In fact, it's so bad I'm quitting softball. I mean, does your client come back and saying, well, that's not what they told me. Is that good enough? Well, Your Honor, in this instance— Assume what I said is true. I'm not holding you to my version of the case. Sure. In this instance, yes, I think that would be good enough for him to create a disputed issue of fact over whether he's telling the truth or whether the players are telling the truth. The overarching question here, of course, is when does the plaintiff have his day in court? But isn't Rolf allowed to believe one over the other? I mean, does Rolf get himself in hot water and expose himself to liability because he believes player complaints over the coach? Well, the question about whether Rolf—that's the main dispute of fact here. There is evidence that Jerry can believe that Rolf did not believe that these were legitimate reasons to terminate Coach Benjamin. Because taking the player complaints, for example, I mean, that is the hardest fact in this case for the plaintiff, obviously. And so taking those here, the ones that happened in 2017, first of all, in 2013 there were player complaints that didn't result in indiscipline. And in 2015 there was a player complaint that didn't result in indiscipline. And it seems there were other complaints prior to 2017 that didn't result in any discipline. Coach Benjamin had never been disciplined at all. As to these six players, I thought you told me the record indicated that of these six players who departed, none of them are included among the complainers about the coach. That's my understanding of the record. But there are five other complaints that happened in February that Athletic Director Rolf's reports having received from players on behalf of five players. Either they came from the players or they came from the parents. And I think those are different players than the players that left in the summer of 2016. But again, I'm not 100 percent sure on that. If Rolf believed that these emails, these player statements indicated that he was abusive and unprofessional, why isn't that an independent justification for failure to renew the contract? If there was no countervailing evidence challenging his true belief on that, then the court, that would be... And what was the evidence that he didn't believe those players' statements? The evidence that the jury can use to believe that he didn't believe them is, number one, his treatment of player complaints in the past, Athletic Director Rolf's. And number two, Coach Benjamin testified in his guest physician testimony and disputed the underlying facts saying that these players had all been disciplined because they'd either violated team rules or, in some cases, the law. And so there was an implicit bias, and those folks had an axe to grind, and that is why they were all related in some way, friends. And so that is the reason for what happened. At least that raises a disputed fact for the jury. Were there any complaints prior to February 2016 about him being abusive, at least verbally, towards players? I didn't get the first part of your question. Is there any record evidence that prior to February 2016, there were complaints that he was verbally abusive to players? I don't think so. I don't recall off the top of my head the contents of the 2013 and 2015 complaint, but that's in the e-mails that are in the record, the 2013 and 2015 e-mail. And it definitely didn't rise to the level of the salaciousness of the allegations that appeared through these five players that came forward. Well, wouldn't that weigh against you? Because one of the things you're talking about is the idea that he'd had complaints before, but they didn't care, and then all of a sudden after he makes this report, then all of a sudden they care about complaints. But it sounds to me like you're conceding that the gravity of the complaints are more serious, that the allegations are more salacious than they were in the early complaints where there wasn't any disciplinary action. Well, it could cut both ways, Your Honor. It could also show that they were fabricated or that they weren't true because these players had an ax to grind, like I said. That, again, raises a dispute, a fact for the jury to determine. Did Ross really believe that, or did he not believe that? Or was he just trying to punish Coach Benjamin for reporting this wrongdoing that happened within the recruiting process? I'm sorry, not the recruiting process. I'm paying student-athlete travel. I'd like to reserve my last minute if I could. You may. Thank you, Judge. May it please the Court. Derek Casey on behalf of the Board of Trustees of Barton County Community College, known commonly as Barton Community College, located in Great Bend, Kansas. Judge Carson, I'd like to pick up with one of your first questions, which kind of goes to one of the reasons why I asked for oral arguments in this case. I was concerned with the plaintiff's position on appeal and their argument, which they make several times in their opening brief and in their reply, that this court and the district court, this being a summary judgment decision, must disregard evidence favorable to the college, which the jury is not required to believe. Mr. Benjamin cites a U.S. Supreme Court case for that proposition, Reeves v. Sanderson-Plumbing, 530 U.S., at 151, a 2000 decision. That citation to authority kind of bothered me a little bit, and I think it's kind of part of your question, Judge Carson, as to, well, should the court just disregard any evidence that could be considered favorable to the college's position in defense and only look at what Mr. Benjamin had to say? And if that's going to be our standard in this, then we can just kind of do away with the McDonnell-Douglas test, which Kansas courts have adopted, which this court has adopted. It's a procedural rule, of course, for Kansas retaliatory discharge cases. But the problem with that citation, with that quotation, is the Supreme Court didn't conclude at that point. The Supreme Court went on to say, the court should give credence to the evidence favoring the non-movement as well as that evidence supporting the movement that is uncontradicted and unimpeached, particularly from disinterested witnesses. And that's what we have in this case. What the plaintiff appellant wants you to do is to disregard the uncontroverted and the unimpeached evidence, particularly from disinterested witnesses. And I'll go into the facts on that a little bit more. I wanted to address one of your questions, Judge Murphy. The allegations of Coach Benjamin's conduct towards players surfaced in April of 2017. Before then, there were no allegations. Those departures in 2015 and 2016, Coach Benjamin gave us some reasons. We didn't challenge those. We don't have any information that he was being abusive to players at that time. The concern from the athletic director was, you're supposed to field 20 players, you're not getting letters of intent. I thought there were complaints about abusive treatment and unprofessional statements in 2013 and 2015. There were two prior parent reports, and what the athletic director testified, he said, in this highly competitive environment, you sporadically get complaints. And he kind of considered those first two to not be that big a deal. It wasn't until that flurry of them in April of 2017 that he became concerned. Were any of the six departing players persons who complained about his conduct or whose parents complained? I'm sorry, would you say that again? The six departing players. In the spring of 2017. Were any of those people who had complained or whose parents complained about his conduct? The ones who departed in 2017 complained about his conduct and reported it to the athletic director. Are these the same six we've been talking about? No, I think we're talking about two different groups, sir. We're talking about the earlier ones. No, they never complained about Coach Benjamin at all. What the athletic director thought was going on, for whatever it's worth, he thought Coach Benjamin was getting ready to go on to bigger and better things and had not recruited. That's what it looked like to him. Again, that's an athletic director's problem that they have to deal with when they have a successful coach, and that's really not the crux of our case. It's one of the factors the athletic director listed. But let's face it, it's his conduct in April of 2017 that pushed it over the edge that caused the conclusion of his employment. Okay, so the investigation begins in April? April of 2017 after he meets with the HR director. Had any of these parental or ballplayer complaints occurred before then? No, they occurred on or before April 11th and after. Shortly before and after April 11th. Effectively, after he begins his investigation. The sequence, as I understand it, is he receives some calls, and I believe this is uncontroverted, he receives some calls from some parents, and what he does when he gets calls like that from parents or student athletes complaining, he says, can you send me something in writing? He went to the HR director, Julie Knoblich, and this is all in the record, and talked to her about it, and she has in her notes, which is attached to her declaration in the record, that they talked about he'd received player complaints and parent complaints. And he initiates his investigation after that meeting with her. So it's those complaints that cause the initiation of the investigation? Yes, yes. Nothing else? Nothing else. All right. Did he make contact with the people who complained in 2013 and 15, like he did with these people in 2016? Did he make contact with them? I don't know the answer to that, sir. I don't recall. So his conduct was different in 2016 in following up with the complaints than it was in 2013 and 2015? He did not make further contact with those parents in 2017. They contacted him by telephone. 2017. 2017. Excuse me, I misspoke. 2016 is when the process began. He's terminated in May 2016, right? I'm sorry, I've misspoken. No, he was terminated in May of 2017. The process began in April of 2017. And Benjamin's disclosure was in February 2017? Yes, February 20th. Okay. All right. In the earlier complaints, you say that there was no follow-up? I'm not aware of any follow-up. I think he followed his same procedure in that he was contacted, he asked them to put it in writing. He didn't think the complaints were that severe and took no further action. He kept them in the file. That was it. All right. How many people had complained at the time he initiated the process? In April of 2017, there were six complaints. Before he initiated the process? No, I don't know exactly when those calls came. Well, that's important because if they come after he initiated the process, they don't relate to the initiation of the process. What does the record indicate of how many complaints by parents or ballplayers were there before he initiated the process? The record indicates that on April 11th, he received the first email. He said he received telephone calls before that, but I don't know if he meant hours or days. We don't have that in the record. How many? We don't have that in the record. So it could be the same number as occurred in 2013 or 2015? It could have been, but they're also vastly different complaints when you read the actual complaints. Do we have the complaints in 2015 in the record? Yes. Do we have the ones in 2013? Yes. Do we have all the complaints that have ever been made against him in the record? By student athlete and by parents. We don't have all the complaints. I don't know that we have all the complaints by other members of the athletic department, except as referenced in deposition testimony. Talking about things like the basketball incident? Yes, things that were not directly leading to his termination, like these incidents were. I wanted to clarify that, that there's two separate groups there. Sorry, let me pick back up where I was. For the purposes of your review of this, I would suggest that the facts, of course, we've already talked about, but there's a few other facts that are uncontroverted that are very important. Mr. Benjamin, on appeal, urges this court to reverse the district court's decision, claiming that timing, that is temporal proximity, the lack of discipline or prior reprimand, and a sham investigation show that the college's reasons for terminating Mr. Benjamin's employment were a pretext for retaliatory discharge. As we talked about in just the last few minutes, Mr. Benjamin made his report of violation of conference rules on February 20th of 2017. It was not until seven weeks later, after Mr. Rolfs had received complaints from parents of disturbing behavior, and I don't think anybody challenges that it's disturbing as to how he was treating some of his student athletes. By the way, Mr. Benjamin did not flatly deny that he engaged in that behavior. He admitted large parts of it. The only part that he denied, and this is in the district court's opinion, he denied that he yelled and screamed at players. He didn't deny the other conduct, and that's in the briefs, and I've talked to him about that in his deposition. He did admit those other events occurred. He put a little different shade on them, but he admitted that most of them occurred. When we're looking at this timing, it was a seven-week interval between the report and when the investigation begins, and then another three or four weeks before the termination actually occurs. That timing, in and of itself, by this court's decisions, is insufficient to establish pretext. And a case that I think that's particularly instructive on that is Twigg v. Hawker Beachcraft, another case out of the District of Kansas, which tells that temporal proximity has minimal probative value in a retaliation case where intervening events between the protected conduct and the adverse employment action provide a legitimate basis for the employer's actions. Here we have those intervening events with those complaints of this disturbing behavior in April of 2017 that occur between the report in February of 2017 and the actual termination in May of 2017. Can you give me generalized categories of the stated reasons for his termination? There were budgetary problems, correct? No, there were no budgetary problems. The stated reasons for his termination, yes, I can do that. I thought I could. I've written them down like five times in the last two days, of course. Are they generalizations from the record as a whole, or is there a letter? No, there's a specific statement given by the college to Mr. Benjamin. It was insubordination, verbally abusive to players and other employees, unprofessional conduct, and the inability to manage the softball program in a professional manner. Didn't the latter include budgetary issues? Oh, yeah, in the sense of he has a fund that he's supposed to fundraise for to buy extra items for the softball team, and he had depleted that and not restored that fund. I was thinking budgetary. Wasn't that the same case in prior years? That had happened several years before, and he had never replenished it. Right. When Mr. Rolfs made his report. And it was not listed as a problem, right? It was not specifically listed. Mr. Rolfs made a complete history report to the president in recommending that his contract not be renewed, and that was one of the factors that was listed in the report by Mr. Rolfs to the president. And unprofessional conduct towards other members of the athletic program? Yeah, I don't remember if that's exactly what was in the memo, but that was certainly – I don't know if that was in the memo given to Mr. Benjamin, but it was in the memorandum given to the president. Did they specify what those incidents were vis-à-vis other employees of the athletic department? To the president or to Mr. Benjamin? In the reasons for his termination. In the reasons the college gave to Mr. Benjamin, did not specify those particularly. What about to the president? To the president, it specified them particularly, yes, in detail. Give me a flavor for what those were. One of them that comes to – well, there was a direct attack on Mr. Rolfs in the autumn before in October of 2016. Mr. Benjamin went to HR and accused Mr. Rolfs, the athletic director, of using racial epitaph and other things of that nature. There was another incident in January of 2016, occurred at the end of a men's basketball game. Mr. Benjamin confronted another member of the athletic department about his assistant coach's conduct and how she managed the table and that she was managing the scorer's table,  She got involved in that dispute and he didn't think that they had acted appropriately towards the assistant coach. And Mr. Benjamin made a scene, for lack of a better description, right in front of the boosters. And that was one of the incidents. Those are the two incidents, I believe, that involved members of the athletic department. So in that time – yes. I'm sorry, I made my own echo. So for those reasons under the Twigg decision, that temporal proximity, standing on its own, it can't be considered. The lack of prior discipline, I think, is readily dealt with under this court's precedent. It wasn't their policy or procedure. It wasn't their practice. They didn't show similarly situated employment. So he can't point to lack of discipline or reprimand. And finally, whether or not it was a sham investigation, really important. There's no indication that the college fabricated the student and parent reports. There's no indication that they solicited those reports. It came to them first. He asked for them in writing, but it came to them first. But most importantly, Mr. Benjamin wants to say he kicked these people off the team, so they had a bias. Mr. Benjamin has never presented any evidence to any court that Mr. Rolfes knew that these people were biased in any way or had an ulterior motive in making these reports to him. And that's what the district court focused on in finding that he'd failed to provide evidence of pretext to support his claim. For that reason, we'd ask this court to affirm. Thank you for your time today. Counsel, Mr. Banucchi, you have some rebuttal? Thank you, Your Honor. Just really quickly on the timing. The timing is the main part of the pretext argument here. The college's counsel is correct. It can't be the only thing on the pretext element, but it can work together with all the other pieces of evidence that demonstrate that the reasons given weren't the true reasons. And here, the timing, the court has kind of picked up on it. These player complaints came in on all the e-mails that were documented came in after April 11th. And April 11th is the date that Mr. Rolfes went to the athletic director and said... But as I understand it, the phone calls came before that. That's what the... These e-mails came in because he asked for them. Your Honor, we don't know... The complaints have been made. Yes, some complaints. We don't know how many. It's vague about what came before April 11th. The record is not clear on exactly how many, when they happened. It's just some phone calls were made. So the timing of this, the way the investigation happened, none of these were ever brought to Coach Benjamin's attention before the termination. That itself gives rise to questions about what was going on here. So the timing, the budget issue that the court was talking about before, there's an inconsistency in the report, internal inconsistency with Mr. Rolfes' own statement. He says he didn't operate his budget properly, but then he says that he has the discretion to operate his budget. So internally, there's an internal inconsistency. There are several inconsistencies in the case that would give rise. We ask the court reverse the summary judgment on the pretext question. Counsel, we appreciate the arguments. You're excused. Thank you, Your Honor.